## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| DAVID MILLER, | ) | Case No. <u>22-cv-762</u> |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| vs. | ) |  |
|  | ) |  |
| CITY OF EXCELSIOR, MINNESOTA; | ) |  |
| BRIAN THOLEN, in his official capacity as | ) | **VERIFIED COMPLAINT** |
| Police Chief for South Lake Minnetonka | ) |  |
| Police Department, and OFFICER | ) |  |
| JOHN DOE, in his individual capacity acting | ) |  |
| as a police officer for South Lake | ) |  |
| Minnetonka Police Department. | ) |  |
|  | ) |  |
| Defendants. | ) |  |

COMES NOW Plaintiff DAVID MILLER ("Plaintiff" or "Miller"), as an individual, by and through his counsel, and as his cause of action against Defendants herein, avers as follows:

### <u>INTRODUCTION</u>

1.       David Miller brings this action seeking declaratory relief, injunctive relief, and nominal damages to redress deprivations by Defendants, CITY OF EXCELSIOR, MINNESOTA ("Excelsior" or "City"), BRIAN THOLEN, in this official capacity as Police Chief for South Lake Minnetonka Police Department, and OFFICER DOE, in his individual capacity acting as a police officer for South Lake Minnetonka Police Department (collectively "Defendants").

2.      This is a civil rights action challenging the City Code, policies, and practices, as well as the City's interpretation and application of the City Code, and policies and practices of South Lake Minnetonka Police Department in enforcing City Code, that create an unconstitutional prior restraint on Miller's use of amplification in the City and, particularly, in the B-1 and B-2 zoning districts of downtown Excelsior.

3.      Pursuant to 42 U.S.C. §§ 1983 and 1988, Miller seeks injunctive relief, declaratory relief, and nominal damages against Defendants.

4.      This action is premised on the United States Constitution concerning the deprivation of Miller's fundamental rights to free expression, free exercise of religion, and due process.

5.      Defendants' actions have deprived and will continue to deprive Miller of his fundamental rights as provided in the First and Fourteenth Amendments to the United States Constitution.

6.      Each and every act of Defendants alleged herein was committed by Defendants named herein, and each and every act was committed under the color of state law and authority.

7.      Miller seeks nominal damages for violation of his constitutional rights on or about April 25, 2020, when Officer Doe threatened Miller with "citation" and/or a "ticket" to Miller for using amplification, and every day since his speech has been stymied.

8.      Miller challenges § 16-105(b)(3) of the City's Code of Ordinances ("Code") on its face and as applied to Miller and his religious expression.

9.      Miller also challenges the City's Code, Article XIV – Special Events § 10-511, *et. seq*, and the Variance therein on their face and as applied to Miller and his expression.

10.     Defendants threatened Miller and continue to threaten him with citation pursuant to the Code based upon the policies, practices, and customs, including the City's Special Event permit application used by the City and South Lake Minnetonka Police Department in interpreting, enforcing, and applying the Code.

## PARTIES

11.     Plaintiff Miller is an individual who resides in Kerkhoven, Minnesota.

12.     Defendant City of Excelsior ("Excelsior" or "City") is a city and municipal corporation located in Hennepin County, Minnesota.  The City has the ability to sue and be sued and the right, power, privilege, and authority to adopt and enforce the Code and Policies. The City is responsible for the training (or lack thereof), of the City's Planner and others who implement the Code and Policies.

13.     Defendant South Lake Minnetonka Police Department ("SLMPD") operates under a cooperative policing arrangement with Excelsior, along with the cities of Greenwood, Shorewood, and Tonka Bay.  SLMPD has the right, power, privilege, and authority to train (or fail to properly train) its officers, agents, and employees to interpret, enforce, and apply the Code and Policies of Excelsior and its own policies, and to do and perform all of the acts pertaining to its local affairs. At all material times, SLMPD was the employer of police officers, including but not limited to DOE, acting to interpret, enforce,

and apply the Code and Policies of Excelsior, and is responsible for the training (or lack thereof), of the police department.

14.   Defendant Officer John Doe in his individual capacity acts as a police officer for SLMPD who enforces the Code and Policies of the City and was at all relevant times employed in SLMPD.  Officer Doe enforced the Code and Policies of Excelsior under color of state law and is sued in his individual capacity. The Verified Complaint will be amended to identify Officer Does as soon as the identity is determined.

## JURISDICTION AND VENUE

15.   Miller brings this action seeking injunctive relief and nominal damages to redress deprivations by Defendants, acting under color of state law, of certain rights secured to Miller and others as alleged herein under the United States Constitution as brought pursuant to 42 U.S.C. § 1983.

16.   Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4), which provide for original jurisdiction in this Court of all suits brought pursuant to 42 U.S.C. § 1983.

17.   Jurisdiction is also conferred on this Court by 28 U.S.C. § 1331 because the cause of action arises under the Constitution and laws of the United States.

18.   This Court is authorized to grant Declaratory Judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure, and to issue the Preliminary and Permanent Injunctive relief requested by Miller under Rule 65 of the Federal Rules of Civil Procedure.

19.     This Court is authorized to grant Miller's prayer for relief and to award Miller's costs in this action for violations of Miller's constitutional and civil rights, including reasonable attorneys fees, pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, Rule 54 of the Federal Rules of Civil Procedure, and 28 U.S.C. § 1920.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside and/or do business in the District of Minnesota and may be found and served in the District of Minnesota.

21.     Venue is proper in the District of Minnesota as all events giving rise to the claims herein occurred in this District.

## FACTS

### *Miller's Desired Expression*

22.     Miller is an evangelical Christian who frequently expresses his faith and beliefs to others in public due to religious conviction.

23.     Miller looks for opportunities to share his deeply held religious beliefs with others in public places, and primarily, he wants to preach in open, public ways to spread awareness of his views on religious, political, and social topics.

24.     Miller engages in these activities as a tenet of his religion.

25.     Miller does not participate in demonstrations.

26.     Miller does not seek to draw a crowd with his expressive activity.

27.     Miller does not solicit money or membership to join any organization when he shares his beliefs.

28.     Miller does not harass anyone or encourage violence.

29.     Miller does not block passageways or hinder pedestrian access.  He is always willing to let people freely pass by him while he is engaging in his religious expression.

30.     The focus of Miller's message is that Jesus Christ came to die for sinners and those who trust in Christ as their Savior will be saved.

31.     To be effective, Miller needs to speak loud enough to be heard by those near him, but he does not wish to yell.  He believes it imperative to convey his message in a softened and non-threatening tone for his message to be received by those who hear it.

32.     Consequently, Miller frequently uses a voice amplifier set at a reasonable volume so he can speak in a conversational tone and still be heard over background noise.

33.     Miller desires to express his religious beliefs on public ways in the City of Excelsior.

34.     Public parks, public streets, public sidewalks, and public rights-of-way within the jurisdiction of the City of Excelsior are traditional public fora.

35.     Miller, citizens, and members of the public utilize the public ways in Excelsior for various activities, including communication and the exchange of ideas.

36.     Miller desires to share his views with people in the City's B-1 and B-2 zoning districts in the downtown area because he can reach a meaningful number of people in these areas.

37.     In the upcoming days – including but not limited to select days from the date of this filing through December 2023 – Miller has concrete plans to engage in his constitutionally-protected activities by peacefully expressing religious, political, and social speech within the City's public ways in the City's B-1 and B-2 zoning districts.

6

38.     If Miller obtains reliefs in this cause, he intends to share his religious beliefs at least once per month, as the weather and his work schedule allow, in the City's B-1 and B-2 zoning districts while in Excelsior, Minnesota, including but not limited to public sidewalk near the intersection of 2nd Street and Water Street.

39.     But as a direct and proximate result of Defendants' enforcement of the Code and Policies, Miller fears criminal sanction for exercising his constitutional rights.

***Excelsior's Code Restricting Amplification***

40.     Excelsior adopted ordinance § 16-105(b)(3) - <u>Radios, amplified sound, B-1 and B-2 zoning districts</u>.

41.     Section 16-105(b)(3) - <u>Radios, amplified sound, B-1 and B-2 zoning districts</u> applies throughout the City's B-1 and B-2 zoning districts and states:

> The use or operation of any radio, musical instrument, sound amplification system, or other machine or device for the amplification or reproduction of sound at such a volume so as to be plainly audible by any person at the property line of its source shall be prohibited.

42.     Section 16-105(a) *Audible* states: "For the purposes of this article, audible should be defined as, capable of being heard; loud enough to be heard; actually heard."

43.     Code § 16-106(d) - <u>Enforcement</u> states in part: "Criminal penalties. Every person who violates any other provision in this article is guilty of a misdemeanor and shall, upon conviction, be punished in accordance with section 1-13. In all cases the city shall be entitled to collect the costs of prosecution to the extent outlined by law, Rules of Criminal Procedure, and the Rules of the Court. Each act of violation and each day a violation occurs or continues constitutes a separate offense."

***Excelsior's B-1 and B-2 Zoning Districts***

44.     Within the City, the B-1 zoning district is called the "Central Business District."

45.     Within the City, the B-2 zoning district is called the "General Business District."

46.     The City's B-1 and B-2 zoning districts encompass substantial portions of the City's downtown area and include large public areas with portions bordering waterfront areas and public parks.

47.     The City's B-1 and B-2 zoning districts contain public sidewalks and public streets bordering Excelsior Bay to the North and State Highway 7 to the south/southeast.

48.     The public sidewalks and streets in the City's B-1 and B-2 zoning districts are open to the general public.

49.     The City's B-1 and B-2 zoning districts contain various business ventures including cafes, restaurants, stores, along with entertainment and music venues welcoming the general public.

50.     Miller seeks to share his religious beliefs while standing on public ways in the City's B-1 and B-2 zoning districts, including but not limited to public sidewalk near intersection of 2nd Street and Water Street.  These ways and the sidewalk are public and open to pedestrians, with no restrictions on travel.

51.      The intersection of 2nd Street and Water Street, Excelsior, Minnesota, is located in the City's B-1 Zoning District and part of the "Central Business District."

### *Excelsior Enforces Code and Policies Against Miller*

52.　On or about April 25, 2020, Miller was peacefully sharing his religious message on a public sidewalk near the intersection of 2nd Street and Water Street in Excelsior, Minnesota.

53.　On or about this date, Officer Doe with SLMPD approached Miller and threatened him with citation and/or a ticket for using an amplifier in the City.

54.　Officer Doe's threat of citation was based on Excelsior § 16-105(b)(3) and policies, practices and customs approved by both the City and SLMPD for interpreting, enforcing, and applying the Code.

55.　The Code's restriction, and its application and enforcement, eliminated, and persists to eliminate, Miller's ability to use amplification because any amplification of his on a public sidewalk would be "plainly audible by any person at the property line of its source."

56.　The ambient noise in the vicinity where Miller wants to speak makes it impossible for Miller to be heard in a conversational tone by his intended audience without amplification.

57.　Due to the text, interpretation, application, and enforcement of the Code, Miller is unable to adequately convey his message to his intended audience in the City's B-1 and B-2 zoning districts.

### *Miller Attempts to Clarify Excelsior's Enforcement of Code and Policies*

58.　Following the threat of citation, Miller wanted to go back to public ways in the City's B-1 and B-2 zoning district and share his religious message.  But due to COVID-

19 and accompanying restrictions on outdoor activities, Miller did not pursue this venture until societal restrictions began to lift in March of 2021.

59.     On March 25, 2021, Miller sent an email to SLMPD to inquire about the use of amplification to share religious message in Excelsior public ways and the applicability of a noise ordinance to his speech.  He wondered if Officer Doe was mistaken about barring amplification.

60.     Having received no response, on April 12, 2021, Miller sent out another inquiry to SLMPD regarding his concerns.

61.     The following day, on April 13, 2021, Officer John Wareham of the SLMPD replied to Miller's entreaty.  Therein, he stated Miller would need a permit from the City to use amplification heard at 30 feet during the day, or, if in the City's B-1 and B-2 zoning districts, the audible distance would be the property line of where it originates, citing the pertinent ordinances.

62.     Miller was discouraged by the news.  Since he wanted to stand on a public sidewalk, he knew the property line was only a few feet away, effectively eliminating his use of amplification.

63.     By email dated April 15, 2021, Miller sought additional information from Officer Wareham and Excelsior city officials to confirm the prohibition on his amplification in the City's B-1 and B-2 zoning districts and about the process of obtaining a permit for amplification.

64.    On April 16, 2021, Amy Edwards, the Events Coordinator for the City of Excelsior, sent an email response to Miller attaching a copy of the City's Special Event permit application, with no explanation or attempt to address Miller's inquiries.

65.    A few days later, April 19, 2021, Officer Wareham with SLMPD responded to Miller that they would let Excelsior's staff deal with Miller's inquires.

66.    On this same day, April 19, 2021, the City Planner for the City, Emily Becker, sent a response to Miller, citing § 16-105(b)(3) in full, indicating to Miller that he could not obtain a permit for amplification, stating: "Unfortunately we do offer a way to conduct specific activities after hours, but not to the exception above. There is no such exception for this kind of thing."

67.    Miller was troubled by the response.  He replied on this same date of April 19, 2021, by email, seeking further clarification and stating: "Thank you for your response. Might you please confirm what you are saying as I am having a hard time understanding your response. So, are you saying that I cannot get a permit to use amplification to preach because such a permit would make the use of amplification plainly audible at the property line of the sidewalk which would therefore be prohibited? I shall look forward to your correspondence."

68.    On April 19, 2021, Emily Becker sent a response to Miller confirming his understanding: "Correct."

***Miller Obtains Confirmation of Restrictions on Amplified Speech on Public Ways in Excelsior***

69.     On May 5, 2021, Miller's counsel sent a letter to the City's Mayor, Todd Carlson, and SLMPD Police Chief Brian Tholen, detailing the enforcement actions and responses from SLMPD and City officials and seeking relief.

70.     Miller's counsel's letter set out Miller's concerns about the restrictions on his amplification use and in B-1 and B-2 zoning district and asked for relief from it.

71.     SLMPD did not respond to Miller's letter. The City, through the City Attorney, responded to the letter by correspondence dated May 24, 2021, but failed to allay Miller's concerns.

72.     In this response letter, the City Attorney defended the City's Code § 16-105(b)(3) and the particulars of its enforcement. The City Attorney indicated Miller could possibly obtain a permit to use amplification on public sidewalk - despite the City Planner's assertion to the contrary - but described a burdensome and limiting process for securing this freedom.

73.     The City Attorney elaborated that Miller would have to comply with the City's special events permit scheme to use amplification, by applying for and securing a permit for individual speech 30 days in advance and paying a $ 150 fee.

74.     The City Attorney added that Miller could seek a "variance" exception for some of the requirements, provided he could show the ordinance would impose an "undue hardship" and not contravene the purpose of the ordinance.

***Miller Attempts to Obtain a Right to Speak Through a Variance to No Avail***

75.     From looking into the variance, and contemplating its verbiage, Miller doubted the provision would alleviate his concerns. He was concerned about having to go

in front of the City Council to seek a variance from the restrictions and to do so without any time limits on when the council would consider and respond to his request.

76.     But Miller's desire to share his religious message in Excelsior did not wane and he eventually decided to explore the variance despite his misgivings about the process.

77.     On January 31, 2022, Miller emailed Amy Edwards and asked if he could get a variance on the $150 fee and the 30-day advance notice requirements associated with the special event permit.

78.     In addressing his undue hardship, Miller explained in the email that the $150 permit per day requirement was too costly.  He also explained that the 30-day advance notice was difficult to navigate due to unpredictability of weather and how it could affect his speech.

79.     Edwards responded by email approximately one week later, on February 7, 2022, advising that the City Council could not consider his request until February 22, 2022, more than three weeks after Miller sought it.  She said she would let Miller know if they needed further information.

80.     Another week passed, and on February 14, 2022, Edwards emailed Miller again.  In this email, Edwards confirmed that Miller's request for a variance was on the City Council's agenda for February 22, 2022 but indicated Miller would have to personally appear before the Council to make this request.

81.     Surprised by the request to go before the City Council, Miller wrote back on this same day and asked why he would need to appear in person.

82.     Edwards replied and explained that the City Council oversees all the City's policies and ordinances and the Council would have to vote on the proposed variance, as City Staff is not able to grant any variance request.

83.     This same day, Miller wrote back and reiterated his question as to why he had to appear in person.  The following day, Edwards advised most applicants answer questions in person but attendance was not mandatory.

84.     Due to time restraints and the inconvenience involved in attending the meeting in person, Miller was not inclined to appear and advised Edwards that he would rest on his paperwork.  Edwards confirmed the request.

85.     On February 18, 2022, Edwards emailed Miller and advised that she had received word from the City Attorney that he would grant the variance request internally for the 30-day advance notice, but the $150 fee was not subject to a variance request.

86.     Miller was dissatisfied with the response because $150 fee for an hour or two speech is exorbitant and not affordable for him.  The prospect of this extraordinarily high cost prevents Miller from seeking a permit.

87.     The next day, February 19, 2022, Miller asked Edwards if she could confirm special event fee, hoping the City might make it less, but a few days later, on February 22, 2022, Edwards responded and confirmed the fee amount of $150.  She added that although they could waive the 30-day notice following approval by the Council, the City would still require 2 more days for processing.

***Excelsior's Ban on Amplification and Need for a Special Events Permit Persists in Eliminating Miller's Speech***

88.     The City's Amplified Sound Code, § 16-105(b)(3), continues to ban amplified sound on public sidewalks that can be heard beyond the boundaries of the sidewalks, effectively barring Miller's amplified speech in the B-1 and B-2 zoning districts.

89.     The effective ban on amplification forces Miller to pursue a special event permit to use amplification for his individual speech on a public way.

90.     The City's Special Event permit application is adopted through the City Code Article XIV – Special Events, containing §10-511 through §10-548.

91.     The City's Special Event permit application states in relevant part:

Once you have determined that your event requires a special event permit, look at the table on the last page to determine the type of event, application deadline, and permit fee. Permits may be submitted no more than one year prior to the event date. Be sure to check the availability of dates by contacting the City Event Coordinator, Amy Edwards, at eventfullyyoursmn@gmail.com or (623) 451-0887 or City Hall at (952) 474-5233 before submitting your application.

<u>Checklist - Events on City Property: Level 1</u>

1. Submit a complete Special Event Permit Application and the permit fee to the City.
2. Application is reviewed by City staff and may be issued immediately with the application fee and a $150 refundable damage deposit.

<u>Application Submittal Deadline and Fee</u>

Level 1 Events: Applications for Level 1 events must be submitted no less than 30 days prior to the event.

Any application that is submitted after the application deadline will be charged a $100 late fee.

A police or code enforcement officer who determines that noise from your event is offensive to others may require you to lower or discontinue the noise.

15

A Site Plan must be submitted with every special event permit application. The Site Plan should include the following information:

Location(s) of the event.

Any street and/or sidewalk closures.

Location and number of all: activity areas, cooking areas, stages, tables, tents, portable toilets, booths, beer gardens, food booths, trash containers and dumpsters and other temporary structures.

Generator locations and source of electricity.

Location of fencing, barriers and/or barricades. Indicate any removable fencing for emergency access.

The provision for a minimum of 20-foot emergency access lanes throughout the event.

Location of first aid facilities and ambulances.

Placement of vehicles and/or trailers.

This permit is not transferable, not refundable, and is not valid for any other date or purpose than specified above. An approved copy of this permit must be available for inspection during the period of use.

A Separate Application is Required for Each Event

Level 1 - Events on City Property
☐ 50-199 participants & spectators
☐ Includes events that use City property and Lake Minnetonka.
☐ Includes Minnetonka School District youth soccer and football programs

Deadline                30 days

Fee Per Day    $150

Sales Tax Multiply 7.525%

Each of the following can add conditions to any permit:

Police Chief or Designee
Fire Chief or Designee
Public Works Superintendent
City Manager

I have reviewed the application and have the following comments and conditions:

_____

92.     Each time Miller would like to use any amplification in the City's B-1 and B-2 zoning districts he is required to submit to the City's special events permit scheme as described in the City's Special Event permit application and seek a variance, and even then, he cannot avoid the delay associated with seeking the variance or the $150 fee.

93.     The City's procedure for seeking a variance is stated in the City's Code § 10-547(c) -- "Variance. An applicant seeking a variance from the requirements of this chapter or the policy adopted pursuant to it may request a variance from the city council by filing an application therefor. Said variance shall be considered by the council within 30 days of receiving the application. No variance shall be granted unless the council finds that application of the ordinance would impose an undue hardship upon the applicant and granting a variance would not be contrary to the purpose of this chapter."

94.     The City's Code § 10- 547(c) does not state how long the City's officials may keep an application for a variance pending before issuing a decision.

95.     The City's Code § 10- 547(c) does not state any criteria the City's officials should use to determine whether to approve or deny a variance.

96.     The City's Code § 10- 547(c) requires Miller carry the burden to prove he would suffer an undue hardship in order to obtain a variance.

97.     The City's Code § 10- 547(b) does not state how long the City's officials may keep an appeal of a variance denial pending before issuing a decision.

98.     Absent seeking and obtaining a variance, each time Miller would like to use any amplification in the City's B-1 and B-2 zoning districts he is required to check the availability of dates by contacting the City Event Coordinator, Amy Edwards, before submitting an application.

99.     Absent seeking and obtaining a variance, each time Miller would like to use any amplification in the City's B-1 and B-2 zoning districts he is required to submit a Special Event permit application no less than thirty (30) days before the date he seeks to use amplification.

100.    Absent seeking and obtaining a variance, each time Miller would like to use any amplification in the City's B-1 and B-2 zoning districts he is required to submit an application fee of $150 plus a refundable damage deposit fee of $150 plus sales tax in the amount of 7.525%.

101.    The Special Event permit application does not state how long the City's officials may keep a Special Event Permit Application pending before issuing a decision.

102.    Each time Miller would like to use any amplification in the City's B-1 and B-2 zoning districts he is required to comply with the conditions in the Special Event permit application stating that "A police or code enforcement officer who determines that noise from your event is offensive to others may require you to lower or discontinue the noise."

103.    Absent seeking and obtaining a variance, each time Miller would like to use any amplification in the City's B-1 and B-2 zoning districts he is required to submit a Site Plan with the Special Event permit application.

104.    The Special Event permit application states any permit issued "is not valid for any other date or purpose."

105.    The Special Event permit application states: "A Separate Application is Required for Each Event."

106.    The Special Event permit application states the Police Chief or Designee, the Fire Chief or Designee, the Public Works Superintendent, and/or the City Manager may apply any conditions to a request under a Special Event permit.

107.    The Special Event permit application does not limit any conditions that the Police Chief or Designee, the Fire Chief or Designee, the Public Works Superintendent, and/or the City Manager may apply to a request under a Special Event permit.

108.    The City's Code § 10- 547(b) does not state how long the City's officials may keep an appeal of any conditions imposed by the Police Chief or Designee, the Fire Chief or Designee, the Public Works Superintendent, and/or the City Manager pending before issuing a decision.

109.    The City's Code § 10- 541(b) provides exemptions to the requirement to seek either a variance or submit to the City's permitting scheme found in the City's Special Event permit application.

110.    The City's Code § 10- 541(b) provides an exemption to "Community athletic events attracting less than 100 spectators that have made reservation arrangements with the City" and "Parades of the Armed Forces of the United States or the military forces of this state."

111.    The City's Code § 10- 541(b) also allows community athletic events attracting less than 100 spectators that have made reservation arrangements with the City to use amplification without seeking either a variance or submitting to the City's permitting scheme found in the City's Special Event permit application.

112.    The City's Code § 10- 541(b) allows parades of the Armed Forces of the United States or the military forces of this state to use amplification without seeking either a variance or submitting to the City's permitting scheme found in the City's Special Event permit application.

***Miller is Suffering an Irreparable, Immediate, and Lasting Impact on his Expression***

113.    As written and applied, the City's Amplified Sound Code, Special Event Permit Code, and Variance therein, operate as an unconstitutional prior restraint on Miller's expression.

114.    As a direct and proximate result of Defendants' prior enforcement of the Code and Policies, Miller is forfeiting his constitutionally protected activities due to fear of citation and fines.

115.    As a direct and proximate result of Defendants' enforcement of the Code and Policies, Miller has been unconstitutionally denied the right to freedom of speech.

116.    As a direct and proximate result of Defendants' enforcement of the Code and Policies, Miller has been unconstitutionally denied the right to the free exercise of his religion.

117.    As a direct and proximate result of the Code and Policies, Miller has been unconstitutionally denied the right to due process.

118.    As a direct and proximate result of Defendants' enforcement of the Code and Policies, Miller was threatened with criminal citation.

119.    As a direct and proximate result of Defendants' enforcement of the Code and Policies, Miller was publicly embarrassed and humiliated.

120.    Defendants' enforcement of the Code and Policies and the City's officers', agents', and employees' actions under color of state law, have deprived, and continue to deprive, Miller of his constitutional rights.

121.    As a direct and proximate result of Defendants' enforcement of the Code and Policies, and the City's officers', agents', and employees' actions under color of state law, Miller fears future citation and fines when exercising his constitutional rights.

122.    As a direct and proximate result of Defendants' enforcement of the Code and Policies, and the City's officers', agents', and employees' actions under color of state law, Miller is uncertain and unsure of his freedom to engage in protected speech.

123.    The deprivation of his rights guaranteed by the United States Constitution has caused Miller to suffer harm.

124.    As interpreted and enforced by Defendants, the Code and Policies prohibit Miller's manner of expressing his religious message.

125.    As interpreted and enforced by Defendants, Miller is subject to the provisions of the Code and Policies.

126.    The threat of Miller suffering future citations and fines is great and immediate.

127.    Based on prior enforcement actions and threat of future enforcement, there is a credible threat that Miller will be cited and fined in the future while attempting to exercise his constitutional rights within the City, including, but not limited to, at the same location where the Code was enforced against Miller on or about April 25, 2020.

128.    The future impingement of Miller's rights is an absolute certainty unless and until this Court grants the injunctive relief requested herein.

129.    Defendants have discouraged Miller from using his constitutional rights to the point Miller fears exercising his constitutional rights.

130.    Miller has specific and concrete intentions to share his religious message via amplification in the City's B-1 and B-2 zoning districts, but he is fearful of being cited, fined, and getting arrested, for exercising his constitutional rights.

131.    The violations of Miller's constitutional rights alleged herein have caused, and will continue to cause, Miller to suffer extreme hardship, both actual and impending, irreparable injury, and damages.

132.    Miller currently suffers from the denial of rights guaranteed by the United States Constitution

133.    All Defendants' actions as described herein are taken under the color of law.

134.    There is a substantial likelihood that Miller will prevail on the merits in this case because Defendants' enforcement of the Code and Policies and Defendants' actions under color of state law constitute an abridgement of Miller's constitutional rights.

135.    The harm to Miller outweighs any subjective harm to Defendants.

136. The public interest is benefited when constitutional and civil rights are protected by the Courts, as contemplated by this cause.

137. Defendants' enforcement of the Code and Policies under color of state law, deprived Miller of his right to freedom of speech, the free exercise of religion, and due process protected by the United States Constitution.

138. Defendants acted without reasonable cause and without due care in causing the deprivation of Miller's rights to freedom of speech, free exercise of religion, and due process protected by the United States Constitution.

139. As a direct and proximate result of Defendants' actions and omissions under color of state law, Miller suffered the loss of Miller's freedom of speech and free exercise of religion protected by the United States Constitution.

140. Defendants' actions and omissions were performed with malice, or oppression, or callous or deliberate indifference, or a conscious disregard of Miller's rights to freedom of speech, free exercise of religion, and due process protected by the United States Constitution.

141. Defendants' enforcement of the Code and Policies under color of state law, are the moving force behind the violation of Miller's rights to freedom of speech, free exercise of religion and due process protected by the United States Constitution.

142. Defendants' enforcement of the Code and Policies under color of state law, operate to unconstitutionally limit, ban, and censor Miller's rights to freedom of speech, free exercise of religion, and due process by the United States Constitution.

143.    Defendants had a duty at all times mentioned herein to implement and enforce policies and procedures to adequately supervise and adequately train its officers, agents, and employees so as to prevent the constitutional violations alleged herein.

144.    Defendants failed to implement and enforce policies and procedures to adequately supervise and adequately train its officers, agents, and employees so as to prevent the constitutional violations alleged herein.

145.    Defendants' actions and omissions regarding the failure to adequately train its officers, agents, and employees so as to prevent the constitutional violations alleged herein exhibit deliberate indifference toward Miller's constitutional rights.

146.    Miller has satisfied all conditions precedent to bringing this action.

147.    Miller is entitled to recover reasonable attorneys' fees and costs from Defendants pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, Rule 54 of the Federal Rules of Civil Procedure, and 28 U.S.C. § 1920.

## COUNT I

### CODE AND POLICIES ON THEIR FACE AND AS APPLIED BY DEFENDANTS VIOLATE THE FREEDOM OF SPEECH CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

148.    Plaintiff realleges each and all of the foregoing paragraphs herein.

149.    The First Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, prohibits unconstitutionally abridging the freedom of speech.

150.    As written and as promulgated, interpreted, and enforced by Defendants, the Code and Policies act as an unconstitutional prior restraint prohibiting Miller's freedom of speech.

151.    Officer Doe's actions were performed under color of state law in that he claimed to be performing an official duty, but his acts were outside the limits of lawful authority and abusive in manner, and he further acted in a way that misused his power and was able to do so only because of his position as public official.

152.    Defendants' actions were taken with malice or reckless indifference to Miller's right to freedom of speech.

153.    On their face and as applied, the Code and Policies unconstitutionally impose a burden on Miller's and other individuals' constitutional rights because they allow for the exercise of unbridled discretion, lack narrow tailoring, fail to achieve any legitimate government purpose, and fail to leave open alternative avenues for expression, and bar the free speech of Miller and possibly other citizens in a traditional public forum.

154.    The Code and Policies on their face and as applied impedes Miller's right to freedom of speech because they deny Miller's right to freedom of speech and satisfies no rational, substantial, or compelling government interest in the least restrictive means possible.

155.    Defendants' code, enforcement, actions, policies, and practices are unconstitutionally overbroad and are not narrowly tailored to address the City's interests, thereby allowing Defendants' agents and employees to unconstitutionally restrict and

prohibit Miller's rights, and those of the general public, to engage in freedom of speech activities otherwise protected by the First Amendment.

156.    Miller was deprived of his right under the First Amendment to engage in freedom of speech activities prohibited by the Code and Policies on their face and as applied.

157.    Miller has been, and continues to be, deprived of his right under the First Amendment to engage in freedom of speech.

158.    Miller has suffered injuries and damages as a result of Defendants' deprivation of his rights, including but not limited to mental and emotional distress, impairment of reputation, personal humiliation, and other tangible and intangible harms that would not exist but for Defendants' actions and/or omissions, and these harms are reasonably certain to be experienced into the future.

## COUNT II

**CODE AND POLICIES ON THEIR FACE AND AS APPLIED BY DEFENDANTS VIOLATE THE FREE EXERCISE OF RELIGION CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**

159.    Plaintiff realleges each and all of the foregoing paragraphs, herein.

160.    The First Amendment to the United States Constitution, applied to the States through the Fourteenth Amendment, prohibits unconstitutionally abridging the free exercise of religion.

161.    Miller has a personal belief in the Biblical mandate to spread the Gospel of Jesus Christ and he engages in speech activities for the purpose of spreading the Gospel of

Jesus Christ.  These activities are prohibited by the Code and Policies, as written and as interpreted and enforced by Defendants.

162.   The Bible instructs believers to share the Gospel of Jesus Christ with others and Miller relies on the Bible to guide his words and actions.

163.   As written and as interpreted and enforced by Defendants, the Code and Policies act as an unconstitutional prior restraint prohibiting Miller's free exercise of religion.

164.   Officer Doe's actions were performed under color of state law, performing an official duty, but his acts were outside the limits of lawful authority and abusive.  The officer acted in a way that misused his power and was able to do so only because of his position as a public official.

165.   Defendants' actions were done with malice or reckless indifference to Miller's rights to the free exercise of religion.

166.   Defendants' enforcement requires Miller to censor his religious speech and imposes a substantial burden on Miller that is not imposed on other individuals.

167.   By forcing Miller to choose between abandoning his religious beliefs in order to gain access to speech in the City's Public Spaces, and, alternatively, abiding by his religious beliefs only to be cited and fined, Defendants have imposed a substantial burden on Miller's sincerely-held religious beliefs and the exercise of his religion.

168.   As applied, the Code and Policies on their face and as applied unconstitutionally impose a burden on the religious exercise of Miller and other individuals.

169.    The Code and Policies on their face and as applied impede Miller's right to the free exercise of religion because they deny Miller's right to the free exercise of religion and satisfy no rational, substantial, or compelling government interest in the least restrictive means possible.

170.    Defendants' enforcement, actions, policies, and practices allow Defendants' agents and employees to unconstitutionally restrict and prohibit Miller's rights, and those of the general public, to engage in free exercise of religion activities otherwise protected by the First Amendment.

171.    Miller was deprived of his right under the First Amendment to engage in free exercise of religion activities prohibited by the Code and Policies on their face and as applied.

172.    Miller has been, and continues to be, deprived of his right under the First Amendment to engage in the free exercise of religion.

173.    Miller has suffered injuries and damages as a result of Defendants' deprivation of his right to freely exercise his religion, including but not limited to mental and emotional distress, impairment of reputation, personal humiliation, and other tangible and intangible harms that would not exist but for Defendants' actions and/or omissions, and these harms are reasonably certain to be experienced into the future.

## COUNT III

### CODE AND POLICIES ON THEIR FACE AND AS APPLIED BY DEFENDANTS VIOLATE THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

174.    Plaintiff realleges each and all of the foregoing paragraphs, herein.

175.    The Fourteenth Amendment to the United States Constitution prohibits unconstitutionally abridging the right to due process.

176.    The Code and Policies as written unconstitutionally impose a burden on Miller's and other individuals' constitutional rights because they are unduly vague.

177.    Miller was deprived of his constitutional right to due process by the Code and Policies.

178.    Miller continues to be deprived of his right to due process.

179.    Miller has suffered injuries and damages as a result of Defendants' deprivation of his right to due process, including but not limited to mental and emotional distress, impairment of reputation, personal humiliation, and other tangible and intangible harms that would not exist but for Defendants' actions and/or omissions, and these harms are reasonably certain to be experienced into the future.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Miller respectfully prays for judgment as follows:

180.    That this Court assume jurisdiction of this matter; and,

181.    That this Court issue a preliminary and permanent injunction restraining and enjoining Defendants, and all persons acting in concert or participating with Defendants,

from enforcing and/or applying the City's Code, Article XIV – Special Events, and the Variance therein, and § 16-105 – Amplified Sound, in the manner Defendants enforced, interpreted and applied it against Plaintiff on or about April 25, 2020, and thereafter; and,

182.   That this Court issue the requested injunctive relief without a condition of bond or other security; and,

183.   That this Court issue Declaratory Judgment under the Declaratory Judgment Act to determine Plaintiff's and Defendants' rights and duties regarding enforcement of the City's Code, Article XIV – Special Events, and the Variance therein, and § 16-105 – Amplified Sound; and,

184.   That this Court enter a judgment and decree declaring that Defendants' enforcement, interpretation, and application of the City's Code, Article XIV – Special Events, and the Variance therein, and § 16-105 – Amplified Sound, against Plaintiff on or about April 25, 2020 violated Plaintiff's constitutional rights; and,

185.   That this Court adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy, in order that such declaration shall have the force and effect of final judgment; and,

186.   That this Court grant Plaintiff an award of nominal damages against Defendants; and,

187.    That this Court grant Plaintiff prejudgment and post-judgment interest; and,

188.   That this Court retain jurisdiction of this matter for the purpose of enforcing any Orders; and,

189.   That this Court award Plaintiff's costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, Rule 54 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1920, or other applicable law; and,

190.   That this Court grant Plaintiff such other and further relief as may be just and proper.

Dated:  March 29, 2022

**CROSSCASTLE PLLC**

/s/ Samuel W. Diehl
Samuel W. Diehl (#388371)
333 Washington Avenue N.
Ste 300-9078
Minneapolis, MN 55401
P: (612) 429-8100
F: (612) 234-4766
Email: sam.diehl@crosscastle.com

**AMERICAN LIBERTIES INSTITUTE**

/s/ Frederick H. Nelson
Frederick H. Nelson, Esq. (Fla #0990523)*
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 786-7007
Facsimile: (877) 786-3573
E-mail: rick@ali-usa.org

**CENTER FOR RELIGIOUS EXPRESSION**

/s/ Nathan W. Kellum
Nathan W. Kellum
(Tenn. #13482, Miss.# 8813)*
699 Oakleaf Office Lane, Suite 107
Memphis, TN  38117
(901) 684-5485 – Telephone
(901) 684-5499 – Fax
E-mail: nkellum@crelaw.org

**AMERICAN LIBERTIES INSTITUTE**

/s/ David J. Markese, Esq.
David J. Markese
(Fla #0105041)*
P.O. Box 547503
Orlando, FL  32854-7503
Telephone:  (407) 786-7007
Facsimile:  (877) 786-3573
Email:  DMarkese@ali-usa.org

***ATTORNEYS FOR PLAINTIFF DAVID MILLER***
*Motions for Admission *pro hac vice* filed concurrently

## VERIFICATION OF COMPLAINT

I, David Miller, a citizen of the United States and a resident of Kerkhoven, Minnesota, hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the factual allegations therein, and the facts as alleged therein are true and correct.


DATED: ___March 29, 2022___          _____/s/David Miller_____
                                                         DAVID MILLER