## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

David Miller,                                    File No. 22-cv-762 (ECT/JFD)

        Plaintiff,

v.                                               **OPINION AND ORDER**

City of Excelsior, Minnesota; Brian Tholen,
*in his official capacity as Police Chief for
South Lake Minnetonka Police Department*;
and Officer John Doe, *in his individual
capacity acting as a police officer for South
Lake Minnetonka Police Department*,

        Defendants.

David Markese and Frederick H. Nelson, American Liberties Institute, Orlando, FL; Samuel W. Diehl, CrossCastle PLLC, Minneapolis, MN; and Nathan W. Kellum, Center for Religious Expression, Memphis, TN, for Plaintiff David Miller.

Katherine M. Swenson, Monte A. Mills, and Emily Muirhead McAdam, Greene Espel PLLP, Minneapolis, MN, for Defendants City of Excelsior, Brian Tholen, and Officer John Doe.

Plaintiff David Miller wants to share his religious views with a voice amplifying device on public sidewalks in the downtown business district of Excelsior, Minnesota. In this lawsuit, he makes facial and as-applied challenges under 42 U.S.C. § 1983 to City of Excelsior ordinances restricting the use of amplified sound. The amplified sound restrictions are most limiting in Excelsior's downtown business districts. There, Excelsior generally prohibits amplified sound that is "plainly audible" at the property line of the property from which the sound emanates. On the narrow public sidewalks where Miller

wishes to preach, this effectively eliminates amplified sound altogether. Outside Excelsior's business districts, amplified sound is allowed most of the day, but must not be audible 30 feet or more from its source. Those wishing to exceed the amplified sound limits may do so only by obtaining a special event permit. Excelsior's special-event-permitting scheme imposes a non-waivable $150 per-day application fee, plus other requirements that may be waived or varied by the City Council, including a 30-day notice requirement. Miller argues that these ordinances violate the rights to free speech, free exercise of religion, and due process under the First and Fourteenth Amendments of the U.S. Constitution.

Miller has moved to preliminarily enjoin enforcement of the challenged ordinances insofar as they prohibit amplified sound in the business districts and require speakers to obtain a special event permit. The motion will be granted in part. On its face, the challenged amplified sound ordinance is probably not narrowly tailored to achieving Excelsior's interests, so Defendants will be preliminarily enjoined from enforcing it. Additionally, two aspects of Excelsior's special-event-permit scheme—its 30-day notice requirement and its $150 per-day fee—are probably unconstitutional as applied to Miller. Thus, Defendants will be enjoined from enforcing those provisions against him.

I

A

Plaintiff David Miller is a Minnesota resident and "evangelical Christian who frequently expresses his faith and beliefs to others in public due to religious conviction." Compl. ¶¶ 11, 22 [ECF No. 1]. Defendant City of Excelsior is a municipal government

and city in Hennepin County, Minnesota. *Id.* ¶ 12. Defendant Brian Tholen is the Police Chief of the South Lake Minnetonka Police Department ("SLMPD"), which polices the City "under a cooperative policing arrangement." *Id.* ¶ 13. The parties now agree Defendant Officer John Doe is SLMPD Sergeant Jim Williams. *Id.* ¶ 14; Williams Decl. [ECF No. 30]; ECF No. 37.

Miller seeks opportunities to share his religious beliefs "in public places, and primarily, he wants to preach in open, public ways to spread awareness of his views on religious, political, and social topics." *Id.* ¶ 23. Miller "does not participate in demonstrations" or "seek to draw a crowd with his expressive activity." *Id.* ¶ 25–26. He does not solicit money or membership to join any organization and "does not block passageways or hinder pedestrian access." *Id.* ¶¶ 27, 29. Miller "frequently uses a voice amplifier set at a reasonable volume" when sharing his beliefs in public places, which enables him to speak in a conversational, non-threatening tone while being heard over background noise. *Id.* ¶¶ 31–32. Miller would like to engage in these activities in Excelsior's B-1 and B-2 zoning districts, which encompass the City's downtown business corridor, "because he can reach a meaningful number of people in these areas." *Id.* ¶¶ 33–39; *see* ECF No. 14-2 (zoning map). The "ambient noise" in Miller's desired locations, he alleges, "makes it impossible for Miller to be heard in a conversational tone by his intended audience without amplification." Compl. ¶ 56.

B

The City has enacted various ordinances regulating noise, codified at Part I, Chapter 16, Article III. *See* Code of Ordinances, City of Excelsior (2022),

*available at* https://library.municode.com/mn/excelsior/codes/code_of_ordinances?nodeId=13367 (last visited August 1, 2022).  The stated purpose of these ordinances is to "protect[] the comfort, repose, health, peace, safety, or welfare of city residents and the quiet enjoyment of property within the city, by imposing reasonable restrictions on the hours during which significant sources of noise may be used or operated."  Code § 16-101.  The ordinances place time and volume restrictions on certain noises and proscribe others except during permitted "special events."  *Id.* §§ 16-102, 16-105.  The level of restriction on amplified sound varies in part with the City's zoning districts, which are depicted in the following map:



ECF No. 14-2 (depicting the "B-1" and "B-2" zoning districts in solid red).

The ordinances limit amplified sound in the B-1 and B-2 zoning districts, except with a special-event permit, as follows:

> *Radios, amplified sound, B-1 and B-2 zoning districts.* The use or operation of any radio, musical instrument, sound amplification system, or other machine or device for the amplification or reproduction of sound at such a volume so as to be plainly audible[1] by any person at the property line of its source shall be prohibited.

*Id.* § 16-105(b)(3). Outside the B-1 and B-2 zoning districts, the unpermitted use of radio and amplified sound is prohibited at volumes "plainly audible . . . at a distance of five feet or more from its source between the hours of 9:30 p.m. and 7:30 a.m. and at a distance of 30 feet or more from its source between the hours of 7:30 a.m. and 9:30 p.m." *Id.* § 16-105(b)(2). A violation of these restrictions is punishable as a misdemeanor, meaning a violator may be sentenced up to 90 days, fined up to $1,000, or both. *Id.* §§ 16-106(d), 1-13 (borrowing definition of "misdemeanor" from Minn. Stat. § 609.02).

Persons who, like Miller, seek to use a voice amplifier may apply for and obtain a special-event permit, and the City Code contains ordinances setting forth the requirements to apply for and obtain a permit, codified at Part I, Chapter 10, Article XIV. These ordinances are designed "to balance the community's interest in serving as a regional destination with its limited capacity for supporting [special] events and its residents' and businesses' legitimate interest in limiting the number of days each year when special events occupy The Commons and Downtown." *Id.* § 10-511. A special event is defined as:

---

1   Audible means "capable of being heard; loud enough to be heard; actually heard." *Id.* § 16-105(a).

> an event or happening organized by any person, firm, organization, or corporation which will generate or invite considerable public or private participation and/or spectators, for a particular and limited purpose and time, including, but not limited to: athletic events, home tour events, boat shows, bicycle rides, carnivals, circuses, concerts, dances, fairs, farmer's markets, festivals, flea markets, parades, parties, reunions, runs, walks, and vehicle shows.  For purposes of this article, special events do not include events held exclusively on private property or city-sponsored events conducted pursuant to a contract between the city and the event organizer.

*Id.* § 10-512.  The City categorizes special events, based on anticipated attendance, into Level 1 (50-199 people), Level 2 (200-1,999 people), and Level 3 (2,000 or more people), and prescribes for each the minimum number of days before an event that an application must be submitted.  *Id.* § 10-544(a).  Because Level 1 events "do not impose a substantial burden on quality of life or city resources," the City does not cap the number or frequency of those events, as it does with Level 2 and Level 3 events.  *Id.* § 10-546.  The City views Miller's plan to use amplified sound—and apparently any similar case of an individual doing so—as a "special event," meaning that a permit is mandatory even though the event is not expected to draw 50 attendees.  *See* Edwards Decl. ¶¶ 8–9 [ECF No. 32]; *see* Code § 10-541(a)(3) (exempting "[s]pecial events attracting attendance of less than 50 people provided such events to [sic] not include amplified sound"); ECF No. 32-1 at 2 ("Regardless of guest count, **any event with amplified sound** . . . **requires an event permit**[.]") (emphasis in original).

The Code directs the City Council to adopt by resolution a "special event policy" that implements its requirements, "including the types of special event permits . . . to be issued and conditions therefor and forms for applying for permits."  *Id.* § 10-547(a).  The

City, which last updated its special-event-permitting process in October 2021, offers a different application for Level 1, Level 2, and Level 3 events. Edwards Decl. ¶¶ 6–7. One seeking to hold a special event must submit the appropriate application to the City's Special Events Coordinator, who reviews it to ensure compliance with the Code and other application requirements. Code § 10-544; Edwards Decl. ¶¶ 4, 10. The Code sets forth the only bases on which a permit application may be denied. Code § 10-546(d); Edwards Decl. ¶ 11.

An applicant may apply for a variance from many of the Code's special-event application requirements. Edwards Decl. ¶¶ 16–17; *see* Code § 10-547(c). The City Council must consider a variance application within 30 days of receiving it. *Id.* To grant a variance, the City Council must find "that application of the ordinance would impose an undue hardship upon the applicant and granting a variance would not be contrary to the [chapter's] purpose." *Id.*; *see* Edwards Decl. ¶¶ 16–19. The City's $150 special-event application fee may not be waived or varied. Code § 10-542(a); Edwards Decl ¶ 14.

C

On April 25, 2020, Miller was "peacefully sharing his religious message" on a public sidewalk near the intersection of 2nd Street and Water Street, in the City's B-1 and B-2 zoning districts. Compl. ¶¶ 51–52. The SLMPD was dispatched after receiving three complaints that Miller was "expressing his religious beliefs to passersby via megaphone and handing out pamphlets." Williams Decl. ¶¶ 3–4; *see also* ECF No. 30-1 (police incident and supplemental reports). Sergeant Williams responded. He parked his vehicle and observed Miller and a companion from "a few shops away on the opposite side of the

7

intersection." Williams Decl. ¶¶ 5–6.  Williams could hear Miller, who wore "a headset with a microphone attached to [a] megaphone," but could not make out what Miller was saying.  *Id.* ¶ 6.  After fifteen or twenty minutes, Miller collected his things and walked with his companion to a car in a nearby parking lot.  *Id.*  Williams followed and parked his vehicle nearby.  After consulting the City Code, Williams drove closer to Miller and his companion and parked his car about ten feet away from them.  Williams explained that, although free to share their views, the use of a megaphone violated the Code's amplified sound restrictions.  *Id.* ¶¶ 8–13; *see also* ECF No. 30-1.  Williams left, and neither Miller nor his companion was cited for violating the Code.  *Id.*; Compl. ¶¶ 53–54.

After his interaction with Sergeant Williams, Miller wanted to return to the City's B-1 and B-2 zoning districts to express his views using amplified sound.  Owing to restrictions on outdoor activities during the COVID-19 pandemic, Miller postponed his efforts to return until March 2021.  Compl. ¶ 58.  Miller emailed the SLMPD in March and April asking whether his use of a particular voice amplification device—the "VoiceBooster MR2300 (Aker) 20watt Voice Amplifier"—would violate the City Code and, if so, what penalty a violation would carry.  ECF No. 32-1 at 17; Compl. ¶¶ 59–60.  The SLMPD responded on April 13 by citing the applicable Code sections and explaining that Miller would need a permit to use amplification heard at 30 feet during the day or, if on a sidewalk in the B-1 and B-2 zoning districts, that "the [maximum allowed] audible distance would be [to] the property line of where it originates.  So if it's a sidewalk, that's not too much distance."  ECF No. 32-1 at 15–16; Compl. ¶ 61.  Miller understood from the email that

"[s]ince he wanted to stand on a public sidewalk, . . . the property line was only a few feet away, effectively eliminating his use of amplification."  Compl. ¶ 62.

On April 15, Miller emailed two SLMPD officers and several city officials.  *Id.* ¶ 63. In the email, Miller asked for confirmation that using the amplification device to preach in the B-1 and B-2 zoning districts would violate the City Code and for information about the special-event-permitting process.  ECF No. 32-1 at 14.  At first, City Planner Emily Becker responded (incorrectly) that the Code contained "no [] exception" for Miller to use the device in the B-1 and B-2 districts.  ECF No. 32-1 at 12–13; Edwards Decl. ¶ 23; Compl. ¶¶ 66–68.  Miller forwarded his email exchange with Becker to Special Events Coordinator Amy Edwards, asking whether Becker had offered a "correct assessment."  ECF No. 32-1 at 11–12.  Edwards explained that Becker was mistaken and outlined the special-event-permitting process.  ECF No. 32-1 at 11.  Edwards wrote that, if the sidewalk remained open to passersby, Miller's event would be Level 1 with a per-day fee of $150.  *Id.*  She attached a copy of the Special Event Permit Application then in effect.  Edwards Decl. ¶ 22; *see* ECF No. 14-5.  Edwards also clarified that "if there were to be no amplified sound, no permit would be required."  ECF No. 32-1 at 11.  Miller did not respond to the email; he would not contact Edwards again until 2022.  Edwards Decl. ¶ 24.

In May 2021, Miller's counsel wrote to Mayor Todd Carlson and SLMPD Chief Brian Tholen demanding "written assurance that the City w[ould] refrain from barring Miller's amplified speech on public sidewalks that can be heard on bordering property line[s]."  ECF No. 14-7 at 3–4; Compl. ¶¶ 69–70.  Three days later, the City Attorney responded by letter, defending the City's view that enforcement would not violate Miller's

constitutional rights. *See* ECF No. 14-8. The City Attorney elaborated that, to use sound amplification in the B-1 and B-2 zoning districts, Miller must apply for a permit 30 days in advance and pay a $150 fee, but that he could seek a variance. *Id.* at 2; Compl. ¶¶ 73–74.

On January 21, 2022, Miller emailed Edwards, requesting a variance on the $150 fee and the 30-day notice requirement. In the email, Miller explained that the fee, imposed on a per-day basis, was too costly and that the unpredictability of inclement weather made the 30-day notice requirement untenable. ECF No. 14-9 at 5; Edwards Decl. ¶¶ 25–26; Compl. ¶¶ 77–78. One week later, Edwards responded that she was "working with the City Managers to have [Miller's] variance request added to the February 22nd City Council Agenda." ECF No. 14-9 at 4; Compl. ¶ 79. On February 14, Edwards emailed Miller seeking confirmation that he would like the variance request added to the February 22 agenda. Edwards wrote that, if he did, the meeting would be held via Zoom and that, after she outlined her "memo," Miller could address the City Council with his request. ECF No. 14-9 at 4. Miller chose not to attend the meeting and to "rest on his paperwork." *Id.* at 2–4; Compl. ¶¶ 80–84.

On February 18, Edwards emailed Miller that the City Attorney would be "internally" granting his request "to waive the 30-day [notice] requirement," but that, "per the City's Special Event Ordinance, Section 10-542 [], special event fees are not subject to variance." ECF No. 14-9 at 2; Compl. ¶ 85. Miller did not respond to this email, and he has not submitted a special-event-permit application to the City. Edwards Decl. ¶¶ 31–32.

D

Miller filed this lawsuit in March 2022.  In a three-count Complaint, Miller asserts facial and as-applied challenges to various sections of the City Code under 42 U.S.C. § 1983.  Miller alleges that the City's amplified sound restrictions, by effectively banning amplified sound in the B-1 and B-2 zoning districts, combined with the City's permitting scheme, violate the First and Fourteenth Amendment rights to free speech, free exercise of religion, and due process.  Compl. ¶¶ 148–179.  Miller also asserts that the special-event-permit scheme imposes an unlawful prior restraint and is unconstitutionally vague.

Miller now moves for a preliminary injunction.  ECF No. 11.  He seeks to enjoin enforcement of "the Amplified Sound Code, § 16-105 and the Special Events Code § 10-511, *et. seq.* so as to prohibit amplified sound or require an individual speaker to obtain a permit in advance and pay a one hundred fifty-dollar ($150) fee to use amplified sound on public sidewalks and ways in the B-1 and B-2 zoning districts of downtown Excelsior." *Id.* at 1.  Miller seeks injunctive relief based on his free speech and due process claims.[2]

III

A preliminary injunction is an "extraordinary remedy."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  "In deciding whether to issue a

---

[2]     Miller does not raise his free exercise claim or legal arguments unique to it in his motion papers.  Mem. in Opp'n at 16–17 n.12 [ECF No. 29].  At oral argument, Miller confirmed that his free exercise claim is coextensive with his free speech claim.  Accordingly, only the merits of Miller's free speech and due process claims are discussed here.

preliminary injunction, the district court considers four factors: '(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest.'" *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)).   The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113 (footnote omitted).   "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

## A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations and internal quotation marks omitted); *Sleep No. Corp.*, 33 F.4th at 1016.   Ordinarily, a movant need not show a greater than fifty percent likelihood of success. *Dwyer*, 294 F. Supp. 3d at 807.   Because Miller seeks to enjoin an ordinance, however, he must show it is more likely than not he will prevail, a standard "reserved for injunctions against the enforcement of statutes and regulations, which are 'entitled to a higher degree of deference and should not be enjoined lightly.'" *Sleep No. Corp.*, 33 F.4th at 1016 (citation omitted). "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary

12

injunctive relief should be denied[.]" *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

When interpreting a state statute or local ordinance, federal courts apply the state's rules of statutory construction. *Behlmann v. Century Sur. Co.*, 794 F.3d 960, 963 (8th Cir. 2015). Two Minnesota canons of statutory construction seem particularly implicated here. First, the Minnesota legislature has stated a preference for "severance of an unconstitutional provision from an otherwise valid statutory framework." *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 800 (8th Cir. 2006) (citing Minn. Stat. § 645.20). Statutes are presumed severable unless the legislature has "specifically stated otherwise." *Matter of Welfare of A.J.B.*, 929 N.W.2d 840, 848 (Minn. 2019). Severing unconstitutional provisions is permissible unless (1) "the valid provisions are so essentially and inseparably connected with, and so dependent upon, the void provisions that the Legislature would not have enacted the valid provisions without the voided language" or (2) "the remaining valid provisions, standing alone, are incomplete and are incapable of being executed in accordance with the legislative intent." *Id.* (citation omitted). Here, the City has declared its intent that the Code be severable. Code § 1-12. Section 16-105(b)(3) of the City Code, which regulates amplified sound in the B-1 and B-2 zoning districts, is severable from the various sections of the special-event ordinance that Miller is challenging. Second, Minnesota courts employ the canon of constitutional avoidance. Courts applying Minnesota law are to "construe statutes to avoid meanings that violate constitutional principles, [but] remain bound by legislative words and intent and cannot rewrite the statute to make it constitutional." *Matter of Welfare of A.J.B.*, 929 N.W.2d at

848.  In other words, the canon of constitutional avoidance may be applied only when the

Minnesota law's language is ambiguous.  *State v. Irby*, 848 N.W.2d 515, 521–22 (Minn.

2014).

1

Start with Miller's challenge to Section 16-105(b)(3), which is best understood as a

facial challenge.[3]  The parties' shared reading of Section 16-105(b)(3) is that unpermitted,

amplified sound is prohibited in the B-1 and B-2 zoning districts at levels plainly audible

at "the property line of where it originates"—including when the sound originates on public

property.  Mem. in Opp'n at 9; *see* Mem. in Supp. at 14–15 [ECF No. 15].  The parties also

seem to agree that Section 16-105(b)(3) prohibits unpermitted amplified sound in those

districts altogether or, at the very least, that it does so on the public sidewalks where Miller

wishes to speak.  Mem. in Supp. at 15–16 ("[T]he City effectively bars amplified speech

on the sidewalk since the volume of any speech would necessarily go beyond the property

line of the sidewalk."); Mem. in Opp'n at 16, 22, 23–24 (describing Miller's available

alternatives repeatedly as using sound amplification "*with a permit* in the B-1 and B-2

zoning districts" or in other districts subject to other requirements); Williams Decl. ¶ 10;

---

[3]      To distinguish between facial and as-applied challenges, the "'important' inquiry is whether 'the claim and the relief that would follow . . . reach beyond the particular circumstances of the[] plaintiff[].'"  *Iowa Right To Life Comm., Inc. v. Tooker*, 717 F.3d 576, 588 (8th Cir. 2013) (quoting *Doe v. Reed*, 561 U.S. 186, 194 (2010)).  Here, the parties' submissions focus almost entirely on Section 16-105(b)(3)'s text and not on Miller's circumstances.  Miller's challenge is "'facial' in that it is not limited to [Miller]'s particular case, but challenges application of the law more broadly."  *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 127 (2d Cir. 2014) (quoting *Tooker*, 717 F.3d at 588) (collecting cases applying facial standard when as-applied challenge indistinguishable from facial challenge).

14

ECF No. 14-8 at 3 ("Excelsior requires a special event permit for any use of amplified sound in the Downtown Business District.").

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully." *Phelps-Roper v. Ricketts*, 867 F.3d 883, 891 (8th Cir. 2017) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  To prevail, a plaintiff must "establish that no set of circumstances exists under which [the challenged law] would be valid, or that the statute lacks any plainly legitimate sweep." *Id.* at 891–92.

The first step in judging the facial constitutionality of a law regulating speech in a public forum is to determine whether it is content-based or content neutral. *Id.* at 892.  A law is "content neutral so long as it is *justified* without reference to the content of the regulated speech." *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). There's no question that Section 16-105(b)(3) is content neutral.  *E.g.*, *Rock Against Racism*, 491 U.S. at 792.

To withstand First Amendment scrutiny, a content-neutral law must be narrowly tailored to serve a significant governmental interest and allow for ample alternative channels of communication*. Id.* at 791, 796, 802.  There are significant governmental interests in this case.  "[I]t can no longer be doubted that government 'ha[s] a substantial interest in protecting its citizens from unwelcome noise.'" *Id.* at 796 (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984)).  Here, the stated purpose of the City's noise ordinance scheme is "to protect the comfort, repose, health, peace, safety, or welfare of [] residents, and the quiet enjoyment of property within the city." Code § 16-101.  Because the City has a significant interest in regulating noise, the

salient issues are whether Section 16-105(b)(3) is narrowly tailored to serve the City's interests and leaves open ample alternative channels of communication.

A regulation is not narrowly tailored if it "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted). A time, place, and manner regulation "need not be the least restrictive or least intrusive means of serving the government's interests." *Id.* (cleaned up). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Rock Against Racism*, 491 U.S. at 800. Thus, "[t]he government's choice among the means to accomplish its end is entitled to deference." *Josephine Havlak Photographer, Inc. v. Vill. of Twin Oaks*, 864 F.3d 905, 915–16 (8th Cir. 2017) (quoting *Ass'n of Cmty. Orgs. for Reform Now v. St. Louis Cnty.*, 930 F.2d 591, 595 (8th Cir. 1991)). Still, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495.

Each party relies on a different U.S. Supreme Court decision assessing the constitutionality of amplified-sound restrictions. Neither case matches this one on all fours, but each informs the narrow-tailoring analysis here. Miller relies on *Saia v. New York*, 334 U.S. 558 (1948). In *Saia*, a city ordinance proscribed the use of loudspeakers or amplifiers without first obtaining a permit from the police chief. The Court found the ordinance facially unconstitutional for essentially two reasons: (1) it set "no standards []

16

for the exercise of [the chief's] discretion"; and (2) the ordinance was "not narrowly drawn to regulate the hours or places of use of loud-speakers, or the volume of sound (the decibels) to which they must be adjusted." *Id.* at 559–60.   In the Court's view, the lack of objective criteria shaping the chief's discretion risked viewpoint censorship, and "[a]ny abuses which loud-speakers create can be controlled by narrowly drawn statutes." *Id.* at 561–62.   Notwithstanding its occasionally broad reasoning, "*Saia* [] does not stand for the proposition that all regulation of sound amplification use in public is unconstitutional, or even for the proposition that such regulation must be limited to decibel restrictions rather than time and place restrictions." *Marcavage v. City of N.Y.*, 918 F. Supp. 2d 266, 272 (S.D.N.Y. 2013).

Defendants rely on *Kovacs v. Cooper*, 336 U.S. 77 (1949).   There, the Court considered an ordinance that "contain[ed] nothing comparable" to the one struck down in *Saia*. *Id.* at 82–83.   The ordinance proscribed "loud and raucous noises" in a city's public ways. *Id.* at 83–85.   The Court held it "a permissible exercise of legislative discretion to bar sound trucks with broadcasts of public interest, amplified to a loud and raucous volume, from the public ways of municipalities," reasoning that the "rights of free speech [could not] compel a municipality to allow such mechanical voice amplification on any of its streets." *Id.* at 87.   It explained:

> It is an extravagant extension of due process to say that because of [free speech] a city cannot forbid talking on the streets through a loud speaker in a loud and raucous tone.   Surely such an ordinance does not violate our people's 'concept of ordered liberty' so as to require federal intervention to protect a citizen from the action of his own local government.   Opportunity to gain the public's ears by objectionably amplified sound on the

streets is no more assured by the right of free speech than is the unlimited opportunity to address gatherings on the streets. The preferred position of freedom of speech in a society that cherishes liberty for all does not require legislators to be insensible to claims by citizens to comfort and convenience. To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself. That more people may be more easily and cheaply reached by sound trucks, perhaps borrowed without cost from some zealous supporter, is not enough to call forth constitutional protection for what those charged with public welfare reasonably think is a nuisance when easy means of publicity are open. Section 4 of the ordinance bars sound trucks from broadcasting in a loud and raucous manner on the streets. There is no restriction upon the communication of ideas or discussion of issues by the human voice, by newspapers, by pamphlets, by dodgers. We think that the need for reasonable protection in the homes or business houses from the distracting noises of vehicles equipped with such sound amplifying devices justifies the ordinance.

*Id.* at 87–89 (cleaned up).

Together, *Saia* and *Kovacs* leave gray area, but teach at least that an outright amplified-sound ban is facially invalid, while cities retain leeway to regulate amplified sound in a manner that is narrowly tailored to preventing the disturbance of others' use and enjoyment of public and private property within its boundaries. This case is not *Saia*. It's not *Kovacs*, either. Here, in contrast to *Saia*, the challenged ordinances don't (by their express terms) impose a blanket ban on amplified sound, subject only to a city official's unfettered discretion. The City uses distance-based volume limitations to regulate amplified noise and offers an objective permit scheme (more on that later). Unlike *Kovacs*, however, the City's regulation of amplified sound is not limited to what is "loud and raucous." As Miller points out, the restrictions in the B-1 and B-2 zoning districts, by

18

eliminating amplified sound audible from the source's property line, effectively eliminate unpermitted sound amplification in public ways in those districts.

By prohibiting all unpermitted amplified sound that can be heard at the property line from where the sound emanates in the B-1 and B-2 zoning districts, it is more likely than not that Section 16-105(b)(3) burdens substantially more speech than necessary to further the City's interests. The critical issue is that the restriction effectively eliminates amplified sound in the public ways of those districts. In doing so, the ordinance becomes untethered to the City's legitimate interests in protecting the use and enjoyment of those public areas. The ordinance is not limited to certain parts of the day; it's in effect at all hours. Most problematically, the ordinance's reach is not limited to loud, raucous, or disturbing sound; or even sound at a volume *likely* to be raucous, disturbing, or to interfere with others' use and enjoyment of the B-1 and B-2 zoning districts. It forbids amplified sound of just about any audible volume. For example, a person walking on a sidewalk who uses a cell phone's speaker feature almost certainly would violate Section 16-105(b)(3) as written. There is no realistic doubt that the voice of the person with whom the cell phone user is speaking would carry beyond the "property line of where it originates"—*i.e.*, the sidewalk's edge. It is noteworthy that, based on common experience, public ways like those in the B-1 and B-2 zoning districts are not a place reserved for quiet pursuits. Yet Section 16-105(b)(3) "prohibits amplification that creates no more noise than a person speaking slightly louder than normal." *U.S. Lab. Party v. Pomerleau*, 557 F.2d 410, 413 (4th Cir. 1977). The City's legitimate interests in noise regulation do not extend to an all-hours prohibition on

amplified sound in the public ways of a downtown business district, particularly in areas that tolerate normal human activity far exceeding that prohibition.

Nor is Section 16-105(b)(3) narrowly tailored by the modestly less-restrictive regulation of amplified sound outside the B-1 and B-2 zoning districts, where amplified sound may not be "plainly audible . . . at a distance of five feet or more from its source" from 9:30 p.m. to 7:30 a.m. or at "30 feet or more from its source" between 7:30 a.m. and 9:30 p.m., Code § 16-105(b)(2)—distances themselves observed by courts to be "so limiting" as to "constitute[] a complete ban on the use of amplified sound." *Lilly v. City of Salida*, 192 F. Supp. 2d 1191, 1194 (D. Colo. 2002) (25-foot limitation on audibility of sound measured from property line); *see also Hassay v. Mayor*, 955 F. Supp. 2d 505, 520–27 (D. Md. 2013) (30-foot audibility restriction "tantamount to a complete ban"); *Deegan v. City of Ithaca*, 444 F.3d 135, 143 (2d Cir. 2006) (reasoning that ban on "any noise that can be heard 25 feet away" would bar speech at decibel lever lower than that "generated by the foot steps of a person in high heeled boots, conversation among several people, the opening and closing of a door, the sounds of a small child playing on the playground, or the ring of a cell phone").

Many courts have invalidated as overbroad amplified sound ordinances that, like Section 16-105(b)(3), prohibited amplified sound outright in public areas or that, to varying degrees, curtailed sound to levels below what's regularly tolerated in the subject forum.[4]

---

[4]    *See Cuviello v. City of Vallejo*, 944 F.3d 816, 828–31 (9th Cir. 2019) (finding facially invalid law requiring permit "for *any* use of a sound-amplifying device at *any* volume by *any* person at *any* location—without any specifications or limitations that may tailor the permit requirement to situations involving the most serious risk to public peace

And there are less restrictive means to regulate amplified sound that would not less effectively achieve the City's interests.  *See, e.g., Kovacs*, 336 U.S. at 79 (approving prohibitions on "loud" and "raucous" amplified sound because those terms "have through daily use acquired a content that conveys to any interested person a sufficiently accurate concept of what is forbidden"); *Costello v. City of Burlington*, 632 F.3d 41, 44–46 (2d Cir. 2011) (upholding law making it unlawful "for any person to make or cause to be made any loud or unreasonable noise" and that defines as unreasonable noise that "disturbs, injures

---

or traffic safety"); *Hassay*, 955 F. Supp. 2d at 520–27 (preliminarily enjoining prohibition on amplified sound audible at 30 feet at city boardwalk that was "tantamount to complete ban"); *Deegan*, 444 F.3d at 143–44 (noise ordinance applied to prohibit "any noise that can be heard 25 feet away" in public park not narrowly tailored); *Dowd v. City of Los Angeles*, No. CV 09-06731 DDP (SSx), 2010 WL 11591900, at *6–8 (C.D. Cal. Oct. 21, 2010) (enjoining total ban on amplified sound on boardwalk except in limited number of spaces as not narrowly tailored); *Lilly*, 192 F. Supp. 2d at 1194 (declaring facially invalid "25 feet limitation on the audibility of sound measured from the property line" without a permit, which was "so limiting that it constitute[d] a complete ban on the use of amplified sound for any form of speech"); *Lionhart v. Foster*, 100 F. Supp. 2d 383, 386–88 (E.D. La. 1999) (holding that law "regulat[ing] the production of sound in excess of 55 decibels within 10 feet of hospitals or churches during posted services" was "unreasonably overbroad in the context of normal activities on public streets and in public parks," and noting uncontroverted evidence that "55 decibels includes the sound of the human voice in normal conversation, as well as automobile traffic"); *United States v. Doe*, 968 F.2d 86, 90–91 (D.C. Cir. 1992) (reversing criminal conviction because ordinance restricting use of sound devices at 60-decibel volume measured at 50 feet in national park was not narrowly tailored); *Reeves v. McConn*, 631 F.2d 377, 383–85 (5th Cir. 1980) (invalidating as overbroad ordinance provisions prohibiting sound amplification in downtown district except for 6 hours on Sunday; citywide except for nine hours per day; within 100 yards of hospital, school, church, or courthouse; and within 50 yards of any residence or hotel); *Pomerleau*, 557 F.2d at 413 (preliminarily enjoining amplified sound ordinance that, as applied, proscribed amplification creating "no more noise than a person speaking slightly louder than normal"); *Maldonado v. Monterey Cnty.*, 330 F. Supp. 1282, 1285–86 (N.D. Cal. 1971) (preliminarily enjoining ordinance that "effectively bar[red] any [amplified] sound louder than the normal human voice" at all hours on public highways and throughfares).

or endangers the peace or health of another" or that "endangers the health, safety or welfare of the community"); *Reeves*, 631 F.2d at 385–86 (upholding prohibition on amplified sound that is "unreasonably loud, raucous, jarring, disturbing, or a nuisance to persons within the area of audibility"); *Harman v. City of Santa Cruz*, 261 F. Supp. 3d 1031, 1044 (N.D. Cal. 2017) (concluding prohibition on noise that is "'unreasonably disturbing' to a person of 'ordinary sensitivities' establishes identifiable criteria that can be measured and assessed pursuant to an objective standard").

In sum, it's more likely than not that Section 16-105(b)(3) is not narrowly tailored to serve the City's interests. The likelihood of success factor therefore weighs in Miller's favor on his facial challenge to Section 16-105(b)(3).[5]

2

Although Section 16-105(b)(3) is likely unconstitutional on its face, its invalidation would not resolve Miller's challenges to the special-event ordinances. Under the City's special-event-permit scheme, any "special event" involving amplified sound requires a permit, no matter how many attendees. Code § 10-541(b)(3). The City views Miller's efforts to stand on the sidewalk and preach using a voice amplifier as a special event. *See* Edwards Decl. ¶¶ 8–9; ECF No. 32-1 at 2.

---

[5]   In view of the determination that Section 16-105(b)(3) is unlikely to withstand intermediate scrutiny because it is not narrowly tailored, there is no need to consider whether it leaves open ample alternative channels of communication. *McCullen*, 573 U.S. at 496 n.9; *see also, e.g.*, *Johnson v. Minneapolis Park & Rec. Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013).

To begin, the parties disagree whether the City's special-event-permit scheme constitutes a prior restraint on speech. Miller insists that the ordinance is a prior restraint, so there is a "heavy presumption" against its validity. Mem. in Supp. at 13–14. The City responds that the special-event-permit scheme is not a prior restraint, because it does not "grant City officials the authority to forbid speech." Mem. in Opp'n at 32. The answer is that the City's permit scheme is a form of prior restraint, but because it is content neutral, the legal framework doesn't change much. A permit or licensing scheme that controls the time, place, and manner of speech must "not delegate overly broad licensing discretion to a government official," "must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." *Forsythe Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (citations omitted); *see United States v. Kistner*, 68 F.3d 218, 221 n.7 (8th Cir. 1995) ("While any permit requirement gives 'public officials the power to deny use of a forum in advance of actual expression,' reasonable time, place, or manner restrictions are a recognized exception to the general prohibition against prior restraints.") (citation omitted).

Miller is best understood to advance facial and as-applied challenges to the special-event ordinances. In all, Miller asserts that various aspects of the City's special-event-permit scheme violate the First Amendment: the non-waivable $150 application fee, the liability insurance requirement, the 30-day notice requirement, the requirement that he provide certain information with his permit application, and the discretion afforded to City officials in granting or denying the permit. Because Miller

challenges discrete requirements within the City's special-event-permit scheme, it is appropriate to "consider each challenged [] requirement in isolation and, if necessary, apply the 'normal rule that partial, rather than facial, invalidation is the required course.'" *Tooker*, 717 F.3d at 588 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

Start with Miller's facial challenge to the special-event ordinance, which is essentially twofold. First, Miller seems to argue that the mere requirement that a special-event holder obtain a permit is facially invalid. For Miller's part, this aspect of his facial challenge to the special-event ordinance relies on the assumption that a permit is required for *any* amplified sound—or at least amplified sound that exceeds the City's restrictions. *See* Reply Mem. at 10–11 ("[T]he constitutional issue is that the permitting scheme, in connection with the noise ordinance, effectively bans *all* amplification without a permit."). Once severed from Section 16-105(b)(3), however, the City Code does not require a permit for every use of amplified sound in the areas where Miller wishes to speak; instead, it exacts a content-neutral permit requirement for special events—defined as events on public property that "will generate or invite considerable public or private participation and/or spectators, for a particular and limited purpose and time," Code § 10-512—that involve amplified sound. The City has a substantial interest in permitting such events due to the time and resources needed to accommodate large crowds in a public forum and the need to balance competing uses within that forum. *E.g.*, *Bowman v. White*, 444 F.3d 967, 981 (8th Cir. 2006). Severed from the City's amplified sound restrictions,

24

Section 10-512 can be construed in a manner that is narrowly tailored to the City's substantial interests.

Second, on both First Amendment and Due Process grounds, Miller argues the special-event-permit scheme vests city officials with unbridled discretion in deciding to grant or deny permits, in placing conditions on permits, and in granting or denying variances to permit requirements. "[W]hen a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 755–56 (1988). "[A] city may enact licensing procedures for conduct commonly associated with expression, so long as the city 'establish[es] neutral criteria to [e]nsure that the licensing decision is not based on the content or viewpoint of the speech being considered.'" *Josephine Havlak Photographer*, 864 F.3d at 918–19 (citations omitted) (alteration in original). A license or permit ordinance "must contain narrow, objective, and definite standards to guide the licensing authority." *Id.* at 919 (cleaned up) (approving ordinance requiring consideration of "the nature of the activity, potential conflicts with other scheduled events, the number of participants, and other factors relevant to resource allocation"). Absent some evidence of discrimination or unfair application, the City's "interpretation and implementation" of its permitting criteria are "highly relevant" to evaluating a facial challenge. *Rock Against Racism*, 491 U.S. at 796.

Here, the Code articulates sufficiently objective and definite grounds on which a permit may be denied. Grounds for denial include the applicant's failure to meet

application requirements, the applicant's previous failure to comply with the special-event ordinances and permit conditions, the applicant's demonstrated inability or unwillingness to conduct a special event in accordance with the ordinance requirements, hardship that would result from accommodating the event due to events already scheduled on the applicant's desired date, the failure to obtain required permits from local agencies, and the determination that an event would cause a safety risk to attendees, result in "significant property damage," or place undue burden on public safety resources.  *See* Code § 10-546(d).

Between his submissions and oral argument, Miller lodged three related arguments to support his assertion that the permit scheme is "devoid of objective standards," but they are not persuasive.  First, Miller argued at the hearing that the special-event ordinance is rendered unconstitutionally vague because the denial criteria are described as grounds on which the City "may" deny a permit, rather than grounds on which it "must" deny a permit. *See* Code § 10-546(d).  Second, he argues that the Code prescribes "applicable conditions" that a special-event holder must follow.  The applicable conditions are described to "include, but not be limited to," those enumerated: the number of attendees, the time allotted for the event, the time allotted for amplified sound, and the event's "physical boundaries."  *See* Code § 10-543.  For this reason, says Miller, the Code "offers no restraint, no direction, for what conditions Officials may saddle a speaker under a Special Events permit."  Mem. in Supp. at 22.  And third, Miller says that the Code's variance provision lacks objective standards.  *Id.* at 23.  Miller's arguments insist on a "degree of rigidity" not required of an ordinance that sets forth objective and definite criteria.  *See*

26

*Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323–25 (2002) (ordinance stating that permit "may" be denied for prescribed reasons did not vest officials with unbridled discretion); *MacDonald v. City of Chicago*, 243 F.3d 1021, 1026–29 (7th Cir. 2001) (rejecting challenge to permit scheme with similar criteria).  Here, the special-event ordinance provides city officials some flexibility in assessing permit applications, but no more than is reasonably necessary to balancing its interests through neutral criteria and conditions tethered to those interests.  This conclusion is bolstered here: on one hand, there is evidence the City has construed and applied its permitting scheme narrowly—the Code sets forth "the only reasons a permit application would be denied," Edwards Decl. ¶ 11—and on the other, the "record contains no evidence that the regulations have been administered in an unfair or discriminatory fashion."  *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 26 (1st Cir. 2002).  On its face, the City Code likewise cabins officials' discretion to grant variances in a permissible manner.  To grant a variance, the City Council must conclude that "that application of the ordinance would impose an undue hardship upon the applicant and [that] granting a variance would not be contrary to the purpose of this chapter."  Code § 10-547(c).  There is nothing suspect about this provision from a First Amendment standpoint.  It does not encourage content or viewpoint discrimination, but affords city officials some discretion to issues permits in limited circumstances that "would do no harm to the policies furthered by the application requirements."[6]  *Thomas*, 534 U.S.

---

[6]     The conclusion that the special-event ordinance does not vest city officials with unbridled discretion applies equally to Miller's due process claim, which depends on the same arguments.  *See* Mem. in Supp. at 23–25.

at 325 ("The prophylaxis achieved by insisting upon a rigid, no-waiver application of the ordinance requirements would be far outweighed, we think, by the accompanying senseless prohibition of speech (and of other activity in the park) by organizations that fail to meet the technical requirements of the ordinance but for one reason or another pose no risk of the evils that those requirements are designed to avoid.").

Miller mounts one other facial attack to the discretion vested on city officials. This challenge is to language found not in the Code, but in the Level 1 event application materials, stating that a "code enforcement officer who determines that noise from your event is offensive to others may require you to lower or discontinue the noise." ECF No. 32-1. In Miller's view, the application language warning against noise that is "offensive" to others renders the special-event ordinance unconstitutionally vague by placing interpretation "in the sole discretion of law enforcement officers." Reply Mem. at 15–16. Miller is right that vesting law enforcement authority to prohibit "offensive" speech is impermissible. *Hill v. Colorado*, 530 U.S. 703, 716 (2000). Yet the challenged language is not found in a law and does not shape city officials' discretion to grant or deny a permit. More importantly, Miller has not shown a likelihood of enforcement of this language against him. He has not shown evidence that Defendants consider his speech "offensive" or threatened to stop him from sharing its content. In fact, the record suggests otherwise. The evidence shows, for instance, that when bystanders complained to the SLMPD about the "views and manner" of Miller's speech, Sergeant Williams defended Miller's speech as "protected under the First Amendment," warned Miller of the need to obtain a permit to use amplified sound, and explained that Miller was free to share his message without a

voice amplifying device.  ECF No. 30-1 at 2–3.  Other city officials echoed this sentiment with Miller in email exchanges.  ECF No. 32-1 at 11 ("Please note, if there were to be no amplified sound, no permit would be required.").

Next consider Miller's as-applied challenge.  "An as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court.  If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." *Republican Party of Minn., Third Cong. Dist. v. Klobuchar*, 381 F.3d 785, 790 (8th Cir. 2004) (internal citations omitted).  "To establish Article III causation in an as-applied challenge, 'a plaintiff must show that its injury is "fairly traceable" to a challenged statutory provision,'" meaning "a plaintiff does not have standing to challenge a policy that was not applied to it." *Young Am.'s Found. v. Kaler*, 14 F.4th 879, 888 (8th Cir. 2021) (citations omitted).  Thus, "[a] plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to [him]." *McCullen*, 573 U.S. at 485 n.4 (emphasis in original); *see, e.g.*, *Advantage Media*, 456 F.3d at 799–801.

Start with the requirement that a special-event holder obtain liability insurance.[7] Miller has not applied for a special-event permit, Edwards Decl. ¶ 32, and he has not

---

[7]     Code Section 10-545 states in relevant part:

> The applicant shall secure and maintain in full force and effect throughout the duration of the permit, commercial general liability insurance written on an occurrence basis with limits of not less than $1,000,000 per occurrence and $2,000,000 general aggregate to include bodily injury and property damage covering potential liability arising from the event.  A

established a likelihood that the City will require him to obtain liability insurance if he does.  The City has offered evidence confirming the insurance requirement is subject to "waiver or variance" under Code Section 10-547(c).  *See* Edwards Decl. ¶ 18.  The City also has submitted evidence that it does not require Level 1 event-holders to obtain insurance.  *Id.*  The Level 1 event application does not solicit insurance information or reference liability insurance, and therefore seems to confirm as much.  *See* ECF No. 32-1 at 2–9.  Because Miller has not shown a likelihood that the Code's liability insurance requirement will be applied to him, he's not shown a likelihood of success on this aspect of his motion.

Miller next challenges the City's 30-day notice requirement for Level 1 special event applications.  "[C]ritically, advance notification requirements eliminate spontaneous speech."  *Berger v. City of Seattle*, 569 F.3d 1029, 1038 (9th Cir. 2009) (en banc) (quotation omitted).  "A municipality needs some time to decide whether to grant [a] permit and if so whether to impose conditions on the grant.  But the length of the required period of advance notice is critical to its reasonableness; and given that the time required to consider an application will generally be shorter the smaller the planned demonstration . . . , a very long period of advance notice with no exception for spontaneous demonstrations unreasonably limits free speech."  *Church of Am. Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003) (citations omitted).  "Advance notice requirements that have been

---

certificate of insurance or similar proof of coverage shall be submitted prior to the event and shall name the city of Excelsior as an additional insured.

upheld by courts have most generally been of less than a week." *Sullivan v. City of Augusta*, 511 F.3d 16, 38–39 (1st Cir. 2007) (collecting cases).   Even shorter notice requirements have failed intermediate scrutiny. *See Douglas v. Brownell*, 88 F.3d 1511, 1523–24 (8th Cir. 1996) (holding that 5-day notice requirement for parade permit application was not narrowly tailored and expressing concern over application to groups of ten or more persons).   In one instance, the Eighth Circuit upheld a two-week notice period, although on facts distinguishable from this case.   In *Josephine Havlak Photographer*, a commercial photographer challenged permit notice requirements imposed on those wishing to engage in commercial activity in a neighborhood park.   864 F.3d at 909–10. The park board required a two-day notice for smaller events and a 14-day notice for events of at least ten people.   *Id.* at 917.   The Court held these notice periods were narrowly tailored given that commercial photography shoots are "rarely spontaneous," there was evidence of "high demand" and "congestion" in the park's limited facilities, and because the 14-day period was reserved for larger events.   *Id.* at 917.

Against this precedent, Miller has shown a sufficient likelihood that the City's 30-day notice requirement, as applied, is not narrowly tailored.   Miller is a single speaker, and a 30 day-notice period places a substantial burden on his right to speak spontaneously in his desired public forum.   And 30 days is an excessively lengthy period for the City to determine whether it can accommodate a small-scale event like Miller's.   There is no evidence, for example, that Miller's speech draws a large crowd or creates some drain on public resources.   The overbreadth of the 30-day notice requirement is not saved by the Code's variance provision, and Miller's case shows why.   The Code requires the City

Council to answer a variance request within 30 days of receiving it.  *See* Code § 10-547(c).

Miller received a variance of the notice requirement to just two days' notice, but he waited

eighteen days for his variance request to be answered.  *See* ECF No. 14-9.  Even with the

prospect of a variance, Miller still shoulders the burden of persuading the City that he is

entitled to a variance, the uncertainty of his request being granted, and the possibility of

not hearing back for weeks.  *Accord Sullivan*, 511 F.3d at 39–40 (finding "good cause"

exception did not cure overbreadth of 30-day application period).

Miller also mounts an as-applied challenge to the City's $150 application fee for

special events, which is nonwaivable and applied by the City on a per-day basis.  Edwards

Decl. ¶¶ 14–15; ECF No. 14–6 at 1.  In Miller's view, this fee is not narrowly tailored to

serve the City's interests.  Mem. in Supp. at 17–18.  The City attests that the special event

fee generally "cover[s] the costs of City staff time spent working with applicants for

special-event permits and the costs of processing the special-event permit applications, as

well as the costs incurred by the City's public works department for special-event location

preparation and clean up and the remediation of the normal wear and tear caused by special

events."  Edwards Decl. ¶ 15.

"The Supreme Court has held that a government cannot profit from imposing

licensing or permit fees on the exercise of a First Amendment right."  *Sullivan*, 511 F.3d

at 38 (citing *Murdock v. Commonwealth of Pennsylvania*, 319 U.S. 105, 113 (1943)).

"Only fees that cover the administrative expenses of the permit or license are permissible."

*Id.* (citing *Cox v. State of New Hampshire*, 312 U.S. 569, 577 (1941)).  Thus, "[t]he cost of

obtaining a permit must align with the cost borne by the government in hosting the

permittee's expressive activity." *iMatter Utah v. Njord*, 774 F.3d 1258, 1268 (10th Cir. 2014). "[A] circus or other large parade can be assessed a larger fee than a small parade, because the former would cause a larger expense to the government than the latter." *The Nationalist Movement v. City of York*, 481 F.3d 178, 184 (3d Cir. 2007) (collecting cases). But a city may not "charge the applicant for the expense to the city of reigning in the hecklers." *Church of Am. Knights of Ku Klux Klan*, 334 F.3d at 680–81; *accord Cent. Fla. Nuclear Freeze Campaign v. Walsh*, 774 F.2d 1515, 1524 (11th Cir. 1985).

On this record, it's more likely than not that a $150 per-day fee is not narrowly tailored to the City's administrative expenses in hosting Miller's First Amendment activity. As Miller describes it, he intends to stand on the public sidewalk and share his views using an amplification device. He does not intend to march in the streets, to impede pedestrians or traffic, to hold demonstrations, or to draw a crowd. *See* Compl. ¶¶ 25–28. Of the expenses the City claims the application fee aims to defray generally, many seem inapplicable or of marginal relevance when applied to Miller's activity, such as the costs of "location preparation," clean up, and "remediation of [] normal wear and tear." Edwards Decl. ¶ 15. And this seems particularly true given that the fee is applied in full for each day that Miller wants to speak. It's reasonable to think that the City's application processing costs are reduced when applied to a multi-day speaker. *See Marcavage*, 918 F. Supp. 2d at 269, 274 (upholding fee of $45 dollar for single-day amplified sound permit, reduced to an additional $5 for each additional day up to maximum four days). To be clear, it's possible that the City's $150 permit fee can be constitutionally applied. This seems unlikely in Miller's case, however, and the City has not offered evidence to the contrary.

Miller also argues that the City's permitting scheme is not narrowly tailored as applied because its application process "forces him to divulge his identity." Mem. in Supp. at 20–21. Not so. It is true that an applicant must provide the name, mailing address, phone number, and email address of their "primary contact person and event coordinator." Code § 10-544(b)(1); *see* ECF No. 32-1 at 6. But the collection of this basic contact information furthers the City's interests in administering its permitting process, which in turn furthers its substantial interests in preventing excessive and competing noise, limiting congestion, and ensuring public safety. At minimum, collecting Miller's contact information "is necessary so that [he] can be notified as to whether and when the application is approved or disproved." *Marcavage*, 918 F. Supp. 2d at 273. On the other hand, requiring Miller to submit this information with his application appears to result in a negligible burden on his ability to speak. Miller's submission of information to the City's administrative officials "does not necessarily result in the disclosure of [his] name to the people he . . . encounters on public thoroughfares." *Id.* If the collection of this information burdens Miller in some meaningful way, he has not described how. Thus, Miller has not shown a likelihood of success on his claim that collection of his contact information with his special-event application is not narrowly tailored to the City's interests.

### B

Irreparable harm "occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "The movant must show that irreparable injury is *likely* in the absence of an injunction, not merely a

possibility of irreparable harm before a decision on the merits can be rendered." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (cleaned up) (emphasis in original). "It is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 ((1976)); *see also Cuviello*, 944 F.3d at 831–34 (ban on unpermitted amplified sound chilled speech and caused irreparable harm, even though it "result[ed] from a threat of enforcement rather than actual enforcement"). Miller intends to exercise First Amendment rights using amplified sound in the B-1 and B-2 zoning districts "at least once per month," but his speech has been chilled by the City's threat of enforcement. Compl. ¶¶ 37–38; *see also* ECF No. 30-1. Miller has shown a likelihood of success that the City's actions violate the First Amendment and a likelihood that, absent an injunction, he is likely to be deterred from exercising his First Amendment rights. He has also shown a likelihood of success on his claim that Section 16-105(b)(3) is facially unconstitutional. Accordingly, the irreparable harm factor favors an injunction.

## C

The final two *Dataphase* factors do not change things. The balance-of-harms factor "involves assessing the harm the movant would suffer absent an injunction, as well as the harm the other parties would experience if the injunction issued." *Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 404 (D. Minn. 2020) (cleaned up). When the government is the opponent, this factor merges with the public interest factor. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Typically, "the public interest favors protecting core

First Amendment freedoms." *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999). To be sure, both Defendants and the public have a strong interest in protecting the safe and enjoyable use of public spaces in the B-1 and B-2 zoning districts. But the record evidence does not suggest those interests would be undermined by allowing Miller to exercise his First Amendment freedoms unburdened by the City's 30-day notice requirement, $150 per-day permit fee, and prohibition on amplified noise in the B-1 and B-2 zoning districts. Thus, the remaining factors weigh, if at all, in favor of an injunction.

IV

Because the *Dataphase* factors each weigh in Miller's favor, he is entitled to injunctive relief. A court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Courts have wide discretion to determine the appropriateness and amount of a bond. *See* 11A Mary K. Kane, *Federal Practice and Procedure* § 2954 (3d ed. Apr. 2022 Update). Here, neither party briefed the issue of what bond amount would be appropriate. The potential costs to the City of this injunction seem slight. The City's discretion to approve or deny special-event permits, to place conditions on those permits, and to manage its public space remains mostly undisturbed. The City will retain authority to regulate nuisance noise and public safety through Code provisions not affected by this injunction. Factor in the constitutional rights at issue and Miller's status as an individual, and a bond in the amount of $150 is appropriate. *See Abdullah v. Cnty. of St. Louis*, 52 F. Supp. 3d 936, 948 (E.D. Mo. 2014) (requiring $100 bond from employee of nonprofit seeking to

restrain enforcement of law restricting speech and assembly rights); *Hassay*, 955 F. Supp. 2d at 527 ($1 nominal bond for preliminary injunction against amplified sound ordinance).

## ORDER

Based on all the files, records, and proceedings in this matter, **IT IS ORDERED** that Plaintiff David Miller's Motion for Preliminary Injunction is [ECF No. 11] is **GRANTED in part** and **DENIED in part** as follows:

1.      Defendants and their officers, agents, employees, and assigns are preliminarily **ENJOINED** from enforcing Chapter 16, Article III, Section 16-105(b)(3) of Excelsior's Code of Ordinances.

2.      Defendants and their officers, agents, employees, and assigns are preliminarily **ENJOINED** from requiring Miller to adhere to Chapter 10, Article XIV, Section 10-544(a)(1) of Excelsior's Code of Ordinances by submitting a special-event-permit application at least 30 days before engaging in the speech activity described in his submissions.

3.      Defendants and their officers, agents, employees, and assigns are preliminarily **ENJOINED** from applying Chapter 10, Article XIV, Section 10-542 of Excelsior's Code of Ordinances to Miller by requiring him to pay a $150 application fee to obtain a permit for the speech activity described in his submissions.

4.      This Order does not prohibit enforcement of any other provision of Excelsior's Code of Ordinances.

5.      The motion is **DENIED** in all other respects.

6.     Miller must post a bond of $150.00 with the Clerk of Court no later than 5:00

p.m. on Wednesday, August 10, 2022.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  August 2, 2022                          s/ Eric C. Tostrud
                                                Eric C. Tostrud
                                                United States District Court